RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0221p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

HEATHER BAKER, Personal Representative of the
Estate of Kyle Baker, Deceased,

　　　　　　　　　　　　*Plaintiff-Appellant*,

　　　*v.*

CITY OF TRENTON; MARK DRISCOLL; STEVE LYONS;
AARON BINIARZ; STEVE ARNOCZKI,

　　　　　　　　　　　　*Defendants-Appellees*.

┐
│
│
│
> No. 18-2181
│
│
│
┘

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:16-cv-12280—Marianne O. Battani, District Judge.

Argued: June 25, 2019

Decided and Filed: August 29, 2019

Before: SUTTON, BUSH, and LARSEN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Mark R. Bendure, BENDURE & THOMAS, PLC, Grosse Pointe Park, Michigan,
for Appellant. Courtney A. Jones, KALLAS & HENK, PC, Bloomfield Hills, Michigan, for
Appellees. **ON BRIEF:** Mark R. Bendure, BENDURE & THOMAS, PLC, Grosse Pointe Park,
Michigan, for Appellant. Courtney A. Jones, KALLAS & HENK, PC, Bloomfield Hills,
Michigan, for Appellees.

───────────────

## OPINION

───────────────

　　JOHN K. BUSH, Circuit Judge. This case involves a tragedy of good intentions. Shortly
before his high school graduation, eighteen-year-old Kyle Baker apparently experimented with

LSD. The after-effects of the drug afflicted him for several days, resulting in his having to be removed from class because of behavioral issues. Kyle's friend, Collin Mathieu, checked in on him after school to see if everything was all right. It was not. Collin went to the police and told them that Kyle needed help and that Kyle was armed and upset with his mother. The police dispatcher sent four officers to the house; lost in the communication, however, was that the mother was not actually home with Kyle. Without waiting for a warrant, the officers entered Kyle's home. He appeared at the foot of the basement stairs, wielding a lawnmower blade. When the officers attempted to subdue Kyle with a taser, he came up the basement stairs swinging. The lawnmower blade struck an officer, who fell back on some stairs or a landing in front of Kyle. The officer then shot and killed the young man.

Kyle's mother, Heather Baker, sued the individual officers and their employer, the City of Trenton, under 42 U.S.C. § 1983 for alleged violations of the Fourth Amendment guarantee against unreasonable searches and seizures, as incorporated against the States by the Fourteenth Amendment. After discovery, the district court granted summary judgment to the defendants, holding that the officers had not committed any such Fourth Amendment violation (and finding in the alternative that the officers had qualified immunity) and that the City could not be liable in the absence of any constitutional violation. Ms. Baker now appeals this determination.

This case is heart-rending, and we have deep sympathy for Kyle's family and friends. Nonetheless, given the circumstances and governing case law, we hold that the officers' entry into Kyle's home and use of force did not violate the Fourth Amendment, and therefore we **AFFIRM** the decision of the district court.

## I. BACKGROUND[1]

In May of 2015, Kyle Baker was set to graduate from Trenton High School in June. His parents, Heather and Tim Baker, were divorced, and Kyle split time between their houses, typically spending weeknights with his father and stepmother and weekends with his mother.

---

[1]This is a fact-intensive case, with many points of dispute between the parties. Because this case was decided on a motion for summary judgment, we construe the facts in the light most favorable to Ms. Baker, the non-moving party. *See Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 861 (6th Cir. 2007).

Sometime in mid- to late-May, Kyle participated in "senior skip day," the traditional day for seniors to cut class. Apparently, on this occasion, Kyle decided to try LSD.

About one week after, on May 28, Kyle was acting oddly at school. The parties agree that his strange behavior may have been caused by after-effects of the LSD. Kyle stared out the window and attempted to shield his eyes from the sun, although the sky was overcast that day. Also, he could not hold an intelligible conversation, instead merely repeating whatever was said to him. As a result, Kyle was sent to the principal's office. There, Kyle continued to behave peculiarly. For example, he said something to the effect that he was lying down, despite the fact that he was standing up. Suspicious that Kyle might be under the influence of drugs, the principal (Dr. Michael Doyle) called the police. In response, Officer Jake Davis of the Trenton Police Department visited the school and observed Kyle.

Davis reported that Kyle was unresponsive to verbal communication. The officer also voiced suspicion that Kyle was under the influence of an intoxicant and asked to speak with Dr. Doyle privately to determine the proper course of action. While they were in another room, Kyle was left alone, and he used that opportunity to leave the school. He did not return.

When Collin Mathieu, a friend of Kyle's, learned what had happened, he texted Kyle's mother to let her know. Additionally, Dr. Doyle called Ms. Baker, as well as separately called Mr. Baker, to advise each of the situation. Ms. Baker reacted by calling Kyle's cell phone, but she initially was not able to reach him. Mr. Baker did reach Kyle, and he instructed his son to go home and remain there. At some point later in the afternoon, Kyle also answered one of his mother's phone calls. He told her that he did not know why Dr. Doyle had called the police, and did not tell his mother where he was. Alarmed by this call, Ms. Baker tried several more times to reach Kyle, but to no avail. She then texted Collin that she was worried about Kyle.

After school, Collin went looking for his friend. He first tried Mr. Baker's house, but Kyle was not there. Collin next checked a local park, but Kyle was not there either. Collin then returned to Mr. Baker's house, where he finally found his friend alone in the basement. Collin took out his cell phone and showed Kyle the text messages from Ms. Baker. Collin then called Ms. Baker, handing his cell phone to Kyle so that he could speak with his mother. The two

talked briefly, after which Kyle refused to return the cell phone to Collin. Instead, according to Collin, Kyle showed him a pocket knife, though Kyle did not unfold the blade.

After this encounter with Kyle, Collin decided to contact the police. Because Kyle had Collin's phone and would not return it, Collin did not call 911 but instead went to the police station in person to ask for help. There, Collin described to Kelsey Pare, a police dispatcher, what had transpired. Collin told Pare about Kyle's call with his mother, but (again according to Collin's account) he did not tell the dispatcher that Ms. Baker was present in the home with Kyle or that Kyle had made threatening remarks toward her. Pare has a different recollection of what Collin told her, and she testified that her dispatch accurately reflected what she had been told. Pare put out the following dispatch:

> We have a teenage male in the lobby here, states that a teenager there named Kyle Baker left school today. When he went to go check on him he states that he had a knife in his home. He was threatening towards his mother. He also stole his cell phone. He left after he pulled the knife out. As far as he knows he's still at the residence. We also have word he possibly may have purchased a shotgun last week. Try and make contact on the house phone but its [sic] just going busy.

R. 25, PageID 489.

Officers Driscoll, Arnoczki, Lyons, and Biniarz responded to the dispatch. After the officers reached Mr. Baker's house but before they entered, Pare communicated further details to them:

> Caller came into station to report that he went to check on a friend that had left school today and when he did, his friend (Kyle Christian Baker, 18 yo w m) was threatening and yelling at his mother. He tried to talk to him and pulled a knife out and took his cell phone. The subj[ect] then went upstairs; The caller left after the subj[ect] went upstairs and came to the [station]; Sgt. Cheplick made several attempts to contact the house phone, busy line[.] Attempted to make contact by cell as well. No answer.[2]

---

[2]In this dispatch, Pare referred to Collin as "caller." There is no evidence in the record, however, that Collin ever "called" the police station; rather, the record is clear that Collin made his report in person.

R. 25-4, PageID 715.  Based on this message, the officers testified that they believed that Kyle, armed with a knife or a shotgun, or both, was holding his mother hostage.**[3]**

Driscoll knocked on the front door of the house, but there was no response.  Arnoczki went around the back and found a door unlocked.  He let himself in, followed by Driscoll and Lyons, while Biniarz stayed at the front door.  Once inside, the three officers loudly announced their presence as the Trenton police and called out asking if anyone was home.  Kyle responded from the basement by shouting obscenities at the police and demanding that they leave.  Biniarz then went around to the back of the house, entering to join his colleagues.  Two officers swept the house (save for the basement) but found neither Ms. Baker nor any weapon.  The officers then positioned themselves at the top of the basement stairs.  They tried to engage in dialogue with Kyle, who was at the foot of the stairs.  The officers asked Kyle where his mother was. Kyle responded that he did not know.  The officers noticed that Kyle was holding a lawnmower blade. They asked him to come upstairs, but he refused.  The four officers would not budge from their positions either.  After several minutes of this standoff, Kyle finally decided to take a couple of steps up the basement stairs.  At that point, Lyons and Biniarz tasered him with projectile tasers from the top of the stairs.  With Kyle seemingly stunned, Driscoll then started down the stairs to subdue him.

As Driscoll descended, however, Kyle stood back up and resumed heading up the stairs. Biniarz, Arnoczki, and Lyons backed off the stairs and into the upstairs kitchen, but Driscoll was unable to fully retreat.  He lost his footing and fell into a seated or semi-seated position on some stairs or on a landing near the top of the staircase.  From his position, Driscoll saw that Kyle was still moving up the stairs with the lawnmower blade in his hand, swinging it erratically. As Driscoll remained pinned on the stairs or the landing, Kyle struck him once with the lawnmower blade, producing a cut wound that required stitches.  At that point, the officer shot his assailant once.  According to Driscoll, he fired upward at Kyle, who stood over him.  But, according to forensic evidence relied upon by Ms. Baker (which we must credit for purposes of

---

**[3]**Officer Cheplick was working dispatch alongside Pare.  Cheplick called Mr. Baker to let him know that police were at his house checking on Kyle and Ms. Baker.  Mr. Baker told Cheplick that he did not believe that Ms. Baker was at the house.  This conversation, however, occurred after the responding officers had already entered Mr. Baker's house.

summary judgment), Driscoll fired downward at Kyle, who at the time of the shot was seven feet away from the officer. The bullet passed through Kyle's abdomen, inflicting injuries that ultimately proved fatal. After Kyle was shot, Lyons went down into the basement and handcuffed him.

Kyle was then taken to the hospital, where he died from the gunshot wound. Only after Driscoll shot Kyle were the officers able to safely enter the basement and ascertain that Ms. Baker was not present. Although Kyle's shotgun was ultimately located under his bed, the record does not indicate whether or where Kyle's pocket knife was found.

In the aftermath of the shooting, the Michigan State Police and the Trenton Police Department investigated the incident, and both determined that the shooting was done in self-defense. The district court determined that the officers did not violate the Fourth Amendment in either their entry of the house or the shooting. Because it found that the officers had not committed any constitutional violation, the district court also held that there was no basis for finding the City liable. Accordingly, the district court granted the motion for summary judgment. Baker timely appealed.

## II.  DISCUSSION

We review the district court's grant of summary judgment de novo. *Maben v. Thelen*, 887 F.3d 252, 258 (6th Cir. 2018). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Because a motion for summary judgment "necessarily implicates the substantive evidentiary standard of proof that would apply at the trial," we must determine "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252. Once the moving party has met the initial burden of showing the absence of a genuine dispute of material fact, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted) (emphasis removed). The non-moving party must

"do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. However, in considering the evidence in the record, the court must view the evidence "in a light most favorable to the party opposing the motion, giving that party the benefit of all reasonable inferences." *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 861 (6th Cir. 2007).

Ms. Baker has three Fourth Amendment claims: 1) that the officers violated Kyle's constitutional rights when they entered the home without a warrant, 2) that Driscoll violated Kyle's constitutional rights when he shot Kyle, and 3) that the City of Trenton violated Kyle's constitutional rights by failing to properly train and discipline its police officers.[4] As explained below, Appellees were properly granted summary judgment as to each of these claims.

## A. Warrantless Entry

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 585 (1980) (quotation omitted). "[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Id.* (quoting *United States v. U.S. Dist. Court*, 407 U.S. 297, 313 (1972)). Because the officers in this case entered the home without a warrant and without permission, their entry was unlawful unless it falls into an exception to this general rule. We conclude that the officers' entry was justified under the exigent-circumstances exception.[5]

"Exigent circumstances are situations where real[,] immediate[,] and serious consequences will certainly occur if the police officer postpones action to obtain a warrant."

---

[4]Initially, Ms. Baker also claimed that the officers violated Kyle's Fifth Amendment rights by refusing to leave the home when Kyle refused to speak with them. However, she has abandoned this claim and we will not consider it.

[5]Because we find that exigent circumstances justified the officers' entry, we do not address Appellees' second argued basis for the warrantless entry—the community caretaker exception, which applies when officers are not engaged in "traditional law enforcement functions." *See United States v. Rohrig*, 98 F.3d 1506, 1521 (6th Cir. 1996).

*Thacker v. City of Columbus*, 328 F.3d 244, 253 (6th Cir. 2003) (internal quotation marks and citations omitted).   There are four recognized situations where exigent circumstances allow a warrantless entry: "(1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others." *United States v. Rohrig*, 98 F.3d 1506, 1515 (6th Cir. 1996).   Baker argues that the first three circumstances do not apply here.  Kyle was not a fleeing felon, no one believed him to be in the process of destroying evidence, and he was not a suspect attempting escape.  Appellees do not dispute these points.  Thus, our analysis focuses on the risk of danger.

"Under the exigent circumstances exception concerning the threat of violence to officers or others, police officers 'may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" *Goodwin v. City of Painesville*, 781 F.3d 314, 332 (6th Cir. 2015) (quoting *Schreiber v. Moe*, 596 F.3d 323, 329–30 (6th Cir. 2010)).   We use an objective test to analyze the circumstances that gave rise to a warrantless entry: "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.'" *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)).   As applied to the danger-to-police-or-others exception, a lawful warrantless entry requires "an objectively reasonable basis for believing . . . that a person within the house is in need of immediate aid." *Goodwin*, 781 F.3d at 332 (quoting *Michigan v. Fisher*, 558 U.S. 45, 47 (2009)).   More specifically, this standard requires us to determine whether "a reasonable person [would] believe that the entry was necessary to prevent physical harm to the officers or other persons." *Brigham City*, 547 U.S. at 402 (citation omitted) (alteration in original).

The facts here indicate that a reasonable person in the officers' position would indeed believe that entry was necessary to prevent physical harm.  The reasonableness standard of the Fourth Amendment requires us to examine the officers' actions in response to the information they had been given.  When those officers arrived at the house, they had only the information they received from the dispatcher.  Based on that information, they could have reasonably believed that Ms. Baker was inside with Kyle, that he was armed in some fashion, with the  knife

or the shotgun, or both, and that he was threatening her.  We have previously considered similar cases.

In *Schreiber v. Moe*, 596 F.3d 323 (6th Cir. 2010), we considered the case of a police officer, William Moe, who entered a home without a warrant in response to a dispatch message from the police station.  In that case, an anonymous 911 caller[6] reported a case of domestic abuse in the home of James Warren Schreiber.  *Id.* at 326.  The message was relayed to Moe (via a message sent to his in-car computer, *id.* at 326 n.1) and indicated that there was "a risk of physical harm to a person at the scene."  *Id.* at 326.  There was a dispute over what Moe observed when he arrived at the home—Moe testified that he saw both Schreiber and Schreiber's teenage daughter Sarah, who was the alleged victim of domestic abuse, whereas Schreiber testified that the only person that Moe could have seen was Schreiber himself.  *Id.*  In any event, Moe entered Schreiber's home without a warrant and against Schreiber's wishes, and a physical altercation between the two ensued.  Schreiber subsequently sued Moe under § 1983 for excessive force and warrantless entry.  *Id.* at 328.

Moe argued that exigent circumstances justified his entry into the home, and we agreed.  Even if Schreiber was correct on the disputed factual point—that is, even if Moe could see only Schreiber, and not Sarah—"Moe's inability to see Sarah would have made it reasonable for him to investigate so that he could confirm that Sarah was okay."  *Id.* at 331.  We pointed out that "[o]fficers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception . . . .  [I]t sufficed . . . that it was reasonable to believe that" a victim was about to be or had already been hurt.  *Id.* (first alteration in original) (internal citations and quotation marks omitted).  Further, we held that Moe committed no violation by remaining in the home even after he determined that Sarah was physically safe.  *Id.*  We pointed out that "a warrantless intrusion into a home must not exceed the exigency that permits it," *id.*; however, once Moe was inside the home, "Schreiber was on the brink of violence and . . . even if . . . Sarah

---

[6]Ms. Baker notes that *Schreiber* involved a 911 call, but the instant case does not.  *See* Appellant Br. at 35. Ms. Baker explains that 911 is "reserved for emergency calls, primarily calls about immediate danger."  *Id.*  Here, of course, instead of calling 911, Collin physically went to the police station to make his report.  This distinction is not legally relevant, because the original source of the dispatcher's information does not affect our analysis of how a reasonable officer—who received the information from a dispatch, not from the original source—would act in response to the information.

was at that point unharmed, a continued police presence was required for a time to prevent any future harm." *Id.*

The circumstances in the instant case are similar. Because of the language of the initial dispatch, the officers could reasonably believe that Ms. Baker was in the home with Kyle and that he was threatening her. They also had been informed that Kyle possessed a knife and had recently purchased a shotgun. From outside the home, the officers could not communicate with anyone inside. Additionally, while they were at the home (and before they entered) the officers were updated with a dispatch stating that attempts to call the house were getting only busy signals. These facts did not dispel them of the notion that Ms. Baker was inside, with Kyle. And because Officer Cheplick's conversation with Mr. Baker did not occur until after the officers had entered the home, it was not part of the mix of information they had to rely upon in deciding whether to enter. Based on the information that had been conveyed to them, those officers, upon arriving at the house and examining the scene from outside (coupled with the update from the station), reasonably could have determined, like the officers in *Schreiber*, that they needed more information to determine the proper course of action. The situation impelled further investigation, and reasonable officers would have believed that "serious consequences [would] certainly occur if [they] postpone[d] action to obtain a warrant." *Thacker*, 328 F.3d at 253.

Given these circumstances—that the officers could reasonably believe based on the dispatch that Kyle was in the home with his mother, and that he was armed and threatening her— a reasonable jury could only conclude that the officers were justified in entering the home to determine that Ms. Baker was safe. And once the officers were inside, given Kyle's erratic behavior and the fact that he was armed with a lawnmower blade, no reasonable jury could fault the officers for remaining in the home.

Ms. Baker attempts to argue to the contrary that exigent circumstances did not justify the entry because Kyle posed no risk of danger to the police or others. She is certainly correct to point out that before the warrantless entry, Kyle did not in reality pose any risk to her. However, she is incorrect insofar as she argues that the officers should have known that Kyle posed no risk of injury to others. While it is true that Ms. Baker was not in the house with Kyle, the undisputed facts demonstrate that the officers reasonably believed that she was present.

We must analyze the actions of those officers on the scene by reference to a reasonable understanding of the information *that they actually received*.  As noted, their actions were reasonable in light of what they reasonably could have understood was happening in the house.

For these reasons, we find that the officers did not violate the Fourth Amendment by their warrantless entry.  Having found no constitutional violation, we need not examine the second prong of qualified immunity (whether the right was clearly established at the time of the violation).  We therefore **AFFIRM** the decision of the district court as to the warrantless entry.

## B.  Excessive Force

Ms. Baker's second claim is that Driscoll violated Kyle's rights under the Fourth Amendment by using excessive force to subdue him.  We examine excessive-force claims under an objective-reasonableness standard: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).  This test is dependent on the facts of the individual case, most importantly "whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* at 396.  A police officer "may not use deadly force against a citizen unless 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'"  *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 902–03 (6th Cir. 1998) (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)).  Thus, the question here is whether the facts, taken in the light most favorable to Ms. Baker, would allow a jury to determine that Driscoll lacked probable cause to believe that Kyle posed a significant threat of death or serious physical injury.

The following facts are not in dispute: at the moment of the shooting, 1) Kyle was holding a lawnmower blade, 2) he was advancing or had partially advanced up the stairs towards Driscoll, 3) Driscoll had fallen backwards onto the stairs or a landing on the stairs, and was in a seated or semi-seated position, and 4) Kyle actually struck Driscoll with the lawnmower blade.  We must judge these facts "from the perspective of a reasonable officer on the scene, rather than

with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Given these facts, no reasonable jury could find for Ms. Baker.

*Chappell v. City of Cleveland*, 585 F.3d 901 (6th Cir. 2009) is instructive. That case arose from a police shooting of an armed adolescent. *Id.* There, two Cleveland police officers executed a search warrant at the residence of a suspected armed robber. *Id.* at 904. In the course of executing the warrant, the officers conducted a protective sweep of the premises. *Id.* During the protective sweep, the officers entered a bedroom that they believed to be unoccupied. *Id.* at 905. After they entered the room, however, they discovered fifteen-year-old Brandon McCloud (the suspected robber) hiding in the closet. *Id.* The officers ordered McCloud to exit the closet and show his hands. *Id.* When McCloud came out of the closet, he was carrying a knife. *Id.* McCloud moved toward the officers, ignoring their commands to stop, and they fired, killing him. *Id.* Subsequently, McCloud's grandmother sued on his behalf under § 1983, alleging that the officers used excessive force in violation of the Fourth Amendment. *Id.* The officers sought summary judgment on the ground that their actions were shielded by qualified immunity, but the district court denied their motion. *Id.*

On appeal, we determined that the district court erred and that the defendants were entitled to summary judgment. As we explained, the key factual question was "whether McCloud posed a serious and immediate threat of harm." *Id.* at 909. Although the district court had determined that the record of that case presented a genuine dispute as to that question, we disagreed:

> The knife-wielding suspect was undisputedly moving toward the officers and had closed to within five to seven feet in a dark, cluttered, enclosed space. Both detectives were backed up against a wall in the small bedroom and there was no ready means of retreat or escape. Considering McCloud's stature (5'7", 165 lbs.) and the size of the knife (described and depicted in photograph as a standard "steak knife" with serrated edge), it is apparent that if the detectives had hesitated one instant, i.e., long enough to allow McCloud to take even one more step, they would have been within his arm's reach and vulnerable to serious or even fatal injury. These undisputed circumstances clearly support probable cause to believe that serious harm was imminently threatened and that use of deadly force in self-defense was justified.

*Id.* at 911.

The similarities between the relevant facts in *Chappell* and those here are striking. Both circumstances involved victims bearing bladed weapons, who approached officers in a narrow, confined space, moved within about six feet of the officers, and were shot and killed by the officers. In the instant case (unlike the deceased in *Chappell*), Kyle actually landed a blow upon the police officer before he was shot. There is some dispute about the actual distance between Kyle and Driscoll at the moment of the shooting, and whether Driscoll fired upward or downward. Appellees assert that Kyle was standing directly over Driscoll at the time of the shooting, and that the officer fired upward defensively. By contrast, Ms. Baker asserts that Kyle was seven feet away from Driscoll, who fired down the stairs at Kyle. Even crediting Ms. Baker's version of the facts, Kyle was within the same five-to-seven-foot zone as the victim in *Chappell*, had already cut Driscoll once with a lawnmower blade, and could have immediately pressed home another assault, perhaps with fatal results. Even on Ms. Baker's version of the facts, no reasonable jury could find that Driscoll used excessive force.

Ms. Baker urges us to distinguish *Chappell* from the facts here. She emphasizes that the victim in *Chappell* was a suspected armed robber, that the officers in *Chappell* had obtained a warrant before entering, and that the officers in *Chappell* had no means of retreat, whereas Driscoll "could have readily retreated, just as the other officers had." Appellant Br. at 47. Baker urges us instead to analogize the instant case to *Bletz v. Gribble*, 641 F.3d 743 (6th Cir. 2011).

In *Bletz*, two police officers were sued for excessive force after shooting Fred Bletz during the execution of a warrant. *Id.* at 747. The officers had a warrant for failure to appear against Zachary Bletz, who was the son of, and lived with, Fred Bletz. *Id.* When Zachary answered the door and stepped outside to talk with the officers, they told him they were there to arrest him for failure to appear. *Id.* at 747–48. However, because Zachary was wearing slippers, the police allowed him to re-enter the house to put on more appropriate footwear before taking him to jail. *Id.* at 748. When the officers followed Zachary into the house, they encountered Fred, who was holding a handgun. *Id.* The officers ordered Fred to put the weapon down. He allegedly was lowering his weapon when the officers fired, killing him. *Id.*

When the decedent's estate sued under § 1983, the district court denied summary judgment to the defendants on qualified immunity grounds. *Id.* at 749. On appeal, we affirmed the denial of qualified immunity. *Id.* In so doing, we distinguished *Bletz* from *Chappell*:

> There are . . . several key differences between the facts in *Chappell* and the instant case. In *Chappell*, the officers had certain knowledge that the suspect had engaged in prior armed robberies using a knife. Here, there was no imputation of past or potential future violence on the part of Fred. In *Chappell,* the officers were in a small room with no opportunity to retreat. Here, the officers were in a breezeway, only feet away from the outside and, arguably, safety. In *Chappell,* the subject had advanced to within five to seven feet and was apparently lunging forward with a knife. Here, Fred was fifteen feet away and was allegedly lowering his weapon.
>
> Most importantly, in *Chappell,* "[n]one of [the] facts [were] refuted by physical or circumstantial evidence and none [were] disputed by contrary testimony. In fact, there [were] no other witnesses who could testify to the circumstances facing the detectives in the bedroom immediately before they fired their weapons." In contrast, here, plaintiff's allegations rest not only on the eyewitness testimony of Zachary, but also on the differences of the testimony and actions of the two defendants.

*Bletz*, 631 F.3d at 753 (internal citations omitted). Ms. Baker asserts that this case is more like *Bletz* than *Chappell*. We disagree.

It is true that Kyle, unlike the deceased who was a previous armed robber in *Chappell*, had not engaged in any known prior violent criminal acts before his encounter with the police. However, the responding officers could reasonably believe from the dispatch that Kyle had threatened his mother and they knew he had shouted obscenities at them and was erratically swinging a lethal object. And unlike the officer in *Bletz*, Driscoll had just been struck by a potentially lethal object, and faced the risk of being struck again. Unlike in *Bletz*, there was no evidence from which a reasonable jury could find that the person who confronted the police was putting his weapon down. Furthermore, although his fellow officers had successfully retreated, Driscoll was in no position to back away from the encounter, as was the case for the officers in *Bletz*. Driscoll had fallen down and was in a vulnerable position. Because Kyle was armed and was at that moment engaged in violence against Driscoll (and further, because previous attempts to nonlethally subdue Kyle had failed), Driscoll justifiably acted in self-defense.

Given that Driscoll had probable cause to believe that Kyle would cause death or serious injury, his use of deadly force was not a violation of Kyle's rights under the Fourth Amendment. Once again, finding no constitutional violation on this count, we need not examine the second prong of qualified immunity. We therefore **AFFIRM** the district court's grant of summary judgment on the excessive-force claim.

### C. Municipal Liability

Municipalities may be held liable under § 1983 for constitutional violations committed by their employees if the violations result from municipal practices or policies. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). However, where there has been no showing of individual constitutional violations on the part of the officers involved, there can be no municipal liability. *See Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) ("If no constitutional violation by the individual defendants is established, the municipal defendant[s] cannot be held liable under § 1983."). Because Ms. Baker has not shown that the individual officers committed any constitutional violation, her claims against the City of Trenton must also fail. Accordingly, we **AFFIRM** the district court's grant of summary judgment as to the municipal liability claim as well.

### III. CONCLUSION

The facts which gave rise to this case are tragic. However, for the foregoing reasons, we **AFFIRM** the decision of the district court.