NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0075n.06
No. 19-3621

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Feb 03, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| CLINTON J. DADE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| DALLAS BALDWIN, Sheriff, in his official | ) | COURT FOR THE |
| capacity; ZACHARY SCOTT, in his individual and | ) | SOUTHERN DISTRICT OF |
| official capacity, | ) | OHIO |
| | ) | |
| Defendants-Appellees. | ) | |

Before: BATCHELDER, LARSEN, and MURPHY, Circuit Judges.

LARSEN, Circuit Judge. Clinton Dade, a deputy in the Franklin County Sheriff's Office, got into a physical altercation with the mother of his children. The sheriff's office then dismissed Dade for violating the office's rules of conduct. Dade filed an action under 42 U.S.C. § 1983 in federal court, claiming that he was fired, not because of his conduct, but because of his intimate relationship with the mother of his children. Such a firing, he argued, violated the First and Fourteenth Amendments to the United States Constitution. Dallas Baldwin, the current county sheriff, and Zachary Scott, the former county sheriff, moved for summary judgment, arguing that Dade's firing did not violate the Constitution. The district court agreed and granted their motion. We AFFIRM.

I.

When reviewing a district court's grant of summary judgment, we consider the facts and all related inferences "in the light most favorable to the party against whom summary judgment was entered." *Franklin Am. Mortg. Co. v. Univ. Nat'l Bank of Lawrence*, 910 F.3d 270, 275 (6th Cir. 2018) (quoting *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013)). We set out the following facts accordingly.

Dade began work as a deputy sheriff in the Franklin County Sheriff's Office in September 2015. As a deputy in that office, he was required to follow its Rules of Conduct. Relevant here, Rule 102.19 prohibited Dade from associating with "[w]rong [e]lements," that is, with known felons, in all but a few circumstances (the Wrong-Elements Rule); Rule 102.29 required him to avoid "unbecoming conduct"—conduct that would reflect poorly on him or the office—"both on and off duty" (the Unbecoming-Conduct Rule); and under Rule 102.43, he could be "suspended or dismissed" for any "violations of rules" (the Dismissal Rule).

Before joining the sheriff's office, Dade had a son with Michelle Whitehall.[1] Dade described his relationship with Whitehall as romantic because they "would have sex" but explained that he "wouldn't say" that he and Whitehall had ever been "boyfriend and girlfriend" because they had never dated "exclusively" and had never lived together.

Early in Dade's tenure as a deputy sheriff, Whitehall filed a complaint against Dade, claiming that he "had beaten her on several occasions," had "dragged her out of his vehicle while she was pregnant," and that he "drinks and drives." Internal affairs opened an investigation and interviewed Dade. Dade admitted that there had been "some aggressive situations" but claimed

---

[1] Whitehall gave birth to a second child, a daughter, during Dade's employment with Franklin County, but Dade did not learn that he was the father of that child until after his employment had ended.

that in each Whitehall had "attacked him and he pushed her away to create distance between them so he could call 911." When Whitehall did not respond to the investigators' various attempts to contact her, internal affairs recommended that the investigation be closed as "unfounded."

As part of the investigation, additional, but ancillary, information came to light. Investigators learned that Whitehall had pleaded guilty to unlawful sexual conduct with a minor in 2006 and was a registered sex offender. They also learned that she had pleaded guilty in 2016 to failing to provide her correct address to the sex offender registry. Dade knew about Whitehall's criminal record prior to joining the sheriff's office.

Shortly after the investigation closed, internal affairs learned that Dade had been "involved in a domestic violence/assault with" Whitehall on August 9 and that the Columbus Police had responded to the incident and had taken a report. Dade recounted that, on that night, "around 1am [sic], I was told by [Whitehall] that I could come over and she would perform oral sex on me." When Dade arrived at Whitehall's home, she got into his car, he offered her wine, and they "talked about [their] son" while she drank. After about fifteen minutes, Dade suggested that they go to a local bar, where he purchased beer "to go" before returning to Whitehall's home. Upon their return, Whitehall "began performing oral sex" on Dade, but stopped when the two began to argue about whether Dade allowed his girlfriend near his and Whitehall's son.

According to Dade, Whitehall then "began to get in [his] face." He asked her to get out of the car, but she refused and began "tossing papers and other items out of [the] vehicle." Dade warned her that he would call the police if she did not stop; she instead punched Dade and scratched his face. When she put him in a headlock, he "bit[] her on the stomach so she would release her hold on [him]." Once he was free, he got out of the car and called 911, but Whitehall grabbed the phone from his hand before he could report his location. He got the phone back and got in the car,

intending to leave, but Whitehall "climbed in" the backdoor. Halfway down the street, Dade stopped the car, got out and "pull[ed] [Whitehall] out of the vehicle by her leg." She got up and began punching him; in response, he "pushed up against her chest and she fell back to the ground." Dade ultimately returned to his home; Columbus police contacted him there.

The ensuing police report listed Whitehall as the victim and Dade as the offender. But because Dade and Whitehall gave "conflicting statements" and there were no "independent witnesses," internal affairs could not determine who had been the "primary physical aggressor." After internal affairs submitted the case file to human resources, the human resources director, Lindsay Rasey, wrote a memo to Sheriff Scott raising "issues" with Dade's conduct "relat[ing] to his employment at the Sheriff's Office" and recommending that he be terminated because of his "propensity to place himself in compromising situations where his conduct is unbecoming of a Deputy Sheriff." From the facts surrounding the August 9 altercation and Dade's prior conduct, Rasey concluded that Dade had violated the Wrong-Elements, Unbecoming-Conduct, and Dismissal Rules.

The Wrong-Elements Rule prohibits officers from "associat[ing] or dealing[] with persons whom they know . . . have a reputation . . . for involvement in felonious or criminal behavior, except . . . when unavoidable because of other personal relationships." The Unbecoming-Conduct Rule requires officers to "conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the Office." "Unbecoming conduct" is defined to include that "which brings the Office into disrepute or reflects discredit upon the individual as a member of the Office, or that[] which impairs the operation, or efficiency of the Office or the individual."

Sheriff Scott accepted Rasey's recommendation and "remov[ed] [Dade] from service" for "failing to comply with rules and regulations and standards of conduct." Dade then filed a § 1983

action in federal court, alleging that he was fired, not for his conduct, but because of his association with the mother of his children. He claimed that this association is an "intimate relationship" protected under both the First and Fourteenth Amendments to the United States Constitution; therefore, firing him based on the Wrong-Elements Rule violated his constitutional rights. He also argued that the Wrong-Elements Rule is unconstitutionally vague.

Baldwin and Scott moved for summary judgment, arguing that the Constitution does not protect Dade's association with Whitehall, but even if it did, Dade was terminated not "because he was with [Whitehall] on August 9, but because of how he behaved that night." The district court granted the motion. It first determined that the "intimate-association doctrine" sounds in the Fourteenth Amendment, not the First, and so granted summary judgment to defendants on Dade's First Amendment Claim. It then determined that the Wrong-Elements Rule did not violate the Fourteenth Amendment and so granted summary judgment to defendants on that issue as well. Finally, the district court determined that Dade's conduct was "clearly proscribed" by the Wrong-Elements Rule; he therefore could not demonstrate that the rule was impermissibly vague.

Dade timely appealed.

## II.

"We review a district court's summary judgment decision de novo, applying the same standards the district court used." *Franklin*, 910 F.3d at 275. Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Because a motion for summary judgment 'necessarily implicates the substantive evidentiary standard of proof that would apply at the trial,' we must determine 'whether reasonable jurors could find by a preponderance of the evidence that the

[non-moving party] is entitled to a verdict.'" *Baker v. City of Trenton*, 936 F.3d 523, 529 (6th Cir. 2019) (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

*Intimate-Association Challenge*. In his complaint, Dade alleged that he was fired for "engaging in constitutionally protected activity." Specifically, he claimed he was terminated for "maintaining a relationship with his son's mother" which, he contended, is "a constitutionally guaranteed right of the First and Fourteenth Amendment[s] to freedom of association." The Supreme Court has noted that the Constitution protects a right to "'freedom of association' in two distinct senses": "freedom of intimate association" and "freedom of expressive association." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18 (1984). The Court described the former right as protecting from "undue intrusion by the State" certain "choices to enter into and maintain certain intimate human relationships." *Id.* The latter right protects associations maintained "for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Id.* at 618.

We use a retaliation framework to evaluate Dade's claim that he was fired because he exercised a right of intimate association. *See Sowards v. Loudon County*, 203 F.3d 426, 431 (6th Cir. 2000); *see also Hartwell v. Houghton Lake Cmty. Sch.*, 755 F. App'x 474, 476 (6th Cir. 2018) (describing the plaintiff's claim that she was "fired . . . because of her relationships with her husband and stepchildren" as advancing "a retaliation theory"). For a retaliation claim to survive summary judgment, there must be a genuine dispute of material fact about whether "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two," that is, the defendants' adverse action was "substantially motivated by the exercise of [the plaintiff's] constitutional rights." *Sowards*,

203 F.3d at 431, 433–34 (quoting *Thaddeus–X v. Blatter*, 175 F.3d 378, 394 (6th Cir.1999) (en banc)). The plaintiff bears the burden of establishing "a causal connection between the protected conduct and the adverse action." *Thaddeus–X*, 175 F.3d at 399. When determining whether the plaintiff has carried his burden, we are concerned with "the subjective motivation of the defendants." *Id.* "Once the plaintiff has met his burden, . . . the burden of production shifts to the defendant" to "show that he would have taken the same action in the absence of the protected activity." *Id.* "If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Id*.

It is important to be precise about the nature of Dade's claim: Dade asserts that he was terminated because he associated with Whitehall in order to co-parent their son. He argues that the co-parent association is an intimate association protected under both the First and the Fourteenth Amendments. Unfortunately, there is some confusion in this circuit about "which provision of the Constitution protect[s] th[e intimate association] right." *Hartwell*, 755 F. App'x at 477–78 (noting the confusion and concluding that the intimate association right arises out of the Fourteenth Amendment). We need not resolve that question, however, or even determine whether there is an intimate association right to co-parent, because we conclude that no reasonable jury could find that Dade's termination was "substantially motivated" by Dade's exercise of such a right. *See Baker*, 936 F.3d at 529; *Sowards*, 203 F.3d at 433–34.

Scott's stated reason for terminating Dade was that Dade had "fail[ed] to comply with rules and regulations and standards of conduct." Scott's decision was based on Rasey's memo, which concluded that Dade had violated multiple rules, any of which was a ground for discipline, including termination. Rasey supported her conclusion with a list of "issues" in Dade's "conduct relate[d] to his employment at the Sheriff's Office." She noted: Whitehall's complaint, filed

before the August 9 altercation, alleging that Dade "drinks and drives" and that he had beaten her and pulled her out of a vehicle; Dade's admission that, during the August 9 altercation, he had pulled Whitehall "out of her vehicle by her feet and bit[] her stomach"; Rasey's own conclusion that Dade "presumably drank alcohol and drove on August 9";[2] and Dade's previous conviction for being under the influence while in "physical control" of a vehicle, *see* Ohio Rev. Code § 4511.194. She also noted that Whitehall was a felon and that Dade "did not have an 'unavoidable' interaction with her" on August 9 but had met with her "for purely personal reasons."

Dade latches onto this final rationale for his termination, asserting that "the real reason [he] was removed was for associating with Ms. Whitehall." The defendants dispute that, saying that Dade's conduct, not his association with Whitehall, caused the termination. We need not untangle the causation question here. Even if a reasonable jury could conclude that Dade was terminated for associating with Whitehall, a known felon, that alone would not violate the Constitution. Dade makes no argument that the Constitution prevents police departments from preventing their officers from fraternizing with criminals generally. Instead, Dade argues that his termination violated the Constitution because it was "substantially motivated by the exercise of [Dade's] . . . intimate association" rights, that is, his right to co-parent. *Sowards*, 203 F.3d at 431. No reasonable jury could find that this was so. Rasey's reasoning, read in the light most favorable to

---

[2] Rasey concluded that Dade "presumably" had been drinking and driving on August 9 and offered that as a reason supporting Dade's termination. Dade resists Rasey's conclusion, noting conflicting testimony on this point. Whitehall's statements noted that Dade "was already drinking on a bottle of Pinot Grigio wine" when he arrived at her home in his car, but Dade's statement said nothing about drinking wine before he arrived and refers to the half bottle of wine Dade had with him only to note that he had told Whitehall "she could have it all." Although we must consider the facts in the light most favorable Dade—in this case, that he did not drink and drive that night—that consideration does not alter the undisputed rationale Rasey provided for her recommendation.

Dade, forecloses such a conclusion; she concluded that Dade violated the Wrong-Elements Rule by associating with Whitehall *not* as a co-parent but as a participant in an altercation. Indeed, she implicitly acknowledged that the rule would provide Dade leeway to associate with Whitehall to co-parent—i.e., "when unavoidable because of other personal relationships"—when she concluded that "[a]lthough she is his son's mother" Dade had associated with Whitehall on August 9 for "purely personal reasons."

Dade objects to that interpretation of the August 9 encounter. In his deposition testimony, Dade stated that Whitehall had asked him to come over to talk about their son, whom Dade was scheduled to pick up later that day. He explained that he tries to keep Whitehall happy because "[w]hen she's not happy, she can be very chaotic in [his] life." So, although he acknowledged that when arranging to meet with Whitehall they "had discussed oral sex," he argues that his reasons for going to see her were parenting-related, rather than "personal" because he "felt [he] needed to go over there in order for things to go smoothly so [he] could get [his] child," as scheduled. Accordingly, Dade contends, his association with Whitehall on August 9 was "for the express purpose of parenting."

No reasonable jury could agree. Even accepting Dade's account that he went to Whitehall's home as part of his efforts to be an effective parent, he has not established a genuine issue of fact about whether his *termination* was "substantially motivated" by those efforts. Indeed, Dade's deposition testimony obfuscates rather than clarifies our inquiry. We are concerned only with Rasey's and Scott's "subjective motivation" for terminating Dade. *Thaddeus–X*, 175 F.3d at 399. Rasey did not consider Dade's deposition testimony when she recommended his termination; that testimony had not yet been given. She had only the internal affairs' report, Dade's and Whitehall's police statements, and Dade's separate account that he offered to the sheriff's office.

In none of those documents did Dade, Whitehall, or anyone else, indicate that Dade had gone to Whitehall's home for a parenting reason; in fact, each of them, including both of Dade's accounts, leads with a non-parenting reason for the meet-up—the opportunity for casual sex. There is simply nothing in the record to indicate that Rasey or Scott had any reason to think that Dade was associating with Whitehall on August 9 in an attempt to co-parent, or that co-parenting "substantially motivated" Dade's termination. In fact, in her deposition testimony, Rasey stated that, when she made her recommendation, she had no reason to believe that Dade's failure to respond to Whitehall's invitation that night "might affect his seeking custody and/or parental rights." Further, Rasey's memo points to Dade's conduct on August 9, not as the sole basis for Dade's termination, but as confirmation of an extant pattern of Dade's "plac[ing] himself in compromising situations where his conduct is unbecoming." Rasey's recommendation and Scott's decision "center[ed] on" *what* Dade had done rather than with *whom* he had done it. *See Hartwell*, 755 F. App'x at 480 (concluding that "a reasonable jury could not find that [the plaintiff's] intimate associations were a substantial or motivating factor of her termination" because the complaints against her "center[ed] on [the plaintiff's] behavior rather than her intimate associations").

Thus, even if we were to assume that the Constitution protects an intimate association right to co-parent, Dade could not prevail. On this record, no reasonable jury could conclude that the cause of Dade's termination was the exercise of any constitutionally protected right. *Thaddeus–X*, 175 F.3d at 399.

*Vagueness Challenge*. Dade also argues that the Wrong-Elements Rule is unconstitutionally vague. [Appellant Br. at 43–45.] We note that the Wrong-Elements Rule is not a criminal statute; it is an employment regulation. And the Supreme Court has made clear that there is substantially more room for imprecision in regulations bearing only civil, or employment,

consequences, than would be tolerated in a criminal code. *See Arnett v. Kennedy*, 416 U.S. 134, 159–60 (1974); *Vill. of Hoffman Estates v. The Flipside*, 455 US 489, 498–99 (1982) ("The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."); *see also Johnson v Morales*, 946 F.3d 911, 2020 WL 104599, at *12 (6th Cir. 2020) ("[T]he Supreme Court has made clear that the void for vagueness doctrine is applied less strictly to economic regulations."); *cf. Fowler v. Bd. of Educ. of Lincoln Cty*. 819 F.2d 657, 666 (6th Cir. 1987). Thus, employment standards "are not void for vagueness as long as ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk of discharge." *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir. 1992) (citing *Arnett*, 416 U.S. at 159).

Dade contends that the Wrong-Elements Rule fails that standard because its exception, permitting association with felons "when unavoidable because of other personal relationships," is "wholly without bounds as to any standard as to what constitutes 'unavoidable' or what constitutes a 'personal relationship.'" We disagree. The Supreme Court has noted, in the employment context, that "[t]here are limitations in the English language with respect to being both specific and manageably brief." *Arnett*, 416 U.S. at 159 (quotation omitted). Accordingly, even the "most conscientious of codes that define prohibited conduct of employees include 'catchall' clauses prohibiting employee 'misconduct,' 'immorality,' or 'conduct unbecoming.'" *Id.* at 161 (quotation omitted). Thus, in *Arnett*, the Court upheld an employment standard permitting dismissal for "such cause as will promote the efficiency of the service." *Id.* at 159. And in *Fowler*, this court upheld an employment regulation prohibiting "conduct unbecoming a teacher" against a vagueness challenge. 819 F.2d at 665–66 (collecting cases); *see also Johnson*, 2020 WL 104599, at *12 (upholding city ordinance permitting suspension of business licenses when "in the interest of the

public health, morals, safety or welfare"). The Wrong-Elements Rule is considerably more definite than these.

Moreover, to succeed on this claim, Dade "must demonstrate that the law is impermissibly vague in all of its applications." *Vill. of Hoffman Estates*, 455 U.S. at 497. Accordingly, "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Id.* at 495 n.7 (quoting *Parker v. Levy*, 417 U.S. 733, 756 (1974)). Even granting Dade's premise that he associated with Whitehall because of "other personal relationships"—namely his "co-parenting" relationship with Whitehall—he cannot show that his August 9 meeting with Whitehall was "unavoidable." "Unavoidable" means "[n]ot avoidable; that cannot be avoided or escaped; inevitable." *Oxford English Dictionary* (2d ed. 1989). Here Dade's own account of the events of August 9 is that he met Whitehall for the purpose of supplying her with alcohol, and having casual sex, which in turn kept Whitehall "happy" and facilitated Dade's access to his son. But the record does not reveal that meeting with Whitehall that night was inescapable or inevitable. *Id.* Dade had been specifically advised that other alternatives were available to him—law enforcement could facilitate custody exchanges. Furthermore, Dade himself testified that "on a few occasions" he had been able simply to arrange the custody transfers over the phone, but he made no such attempt on August 9. Because Dade's conduct was not unavoidable, the Wrongful-Elements Rule clearly applied here. He therefore cannot not show that the rule is "impermissibly vague in all of his applications," *see Vill. of Hoffman Estates*, 455 U.S. at 497, and his vagueness challenge fails.

\* \* \*

For these reasons, we AFFIRM the district court's grant of summary judgment.