NOT RECOMMENDED FOR PUBLICATION

File Name: 20a0121n.06

CASE NO. 18-6069

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| PATRICK M. GREVE, | ) | |
| | ) | **FILED**<br>Feb 25, 2020<br>DEBORAH S. HUNT, Clerk |
| *Plaintiff-Appellant*, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| AUSTIN J. BASS, *et al.*, | ) | COURT FOR THE MIDDLE |
| | ) | DISTRICT OF TENNESSEE |
| *Defendants-Appellees*. | ) | |

Before: BATCHELDER, GRIFFIN, and DONALD, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge.** When Police Officer Austin Bass responded to an after-hours break-in at a nightclub ("Club") owned by M Street Entertainment Group ("MSEG"), he immediately spotted, suspected, and detained Patrick Greve. He refused to hear Greve's explanation or consider any exonerating facts or circumstances. When the Club's night manager, Oleg Bulut, arrived, he chose to press charges instead of corroborating Greve's explanation of the exonerating circumstances or providing the Club's surveillance video, which would have cleared Greve; no one at MSEG ever chose to help Greve by sharing or acting on their knowledge and evidence of his innocence. Officer Bass arrested Greve on charges of public intoxication and attempted burglary, but the state court dismissed the charges. Greve sued in federal court, accusing Bass of false arrest in violation of the Fourth Amendment, and accusing Bulut and MSEG of malicious prosecution in violation of Tennessee law. The district court granted the defendants' motion for summary judgment and Greve appeals, claiming that genuine disputes of material fact should have been submitted to a jury: namely, whether Officer Bass had

probable cause for the arrest and whether Bulut and MSEG furthered the criminal prosecution. Because we agree with Greve, we REVERSE and REMAND for further proceedings.

## I.

This is an appeal from the district court's grant of summary judgment, which we review de novo, following the same standard that governed the district court. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering these facts, we view the evidence "in a light most favorable to the party opposing the motion, giving that party the benefit of all reasonable inferences." *Baker v. City of Trenton*, 936 F.3d 523, 529 (6th Cir. 2019).

Here, Greve is "the party opposing the motion," so we proceed from his account of the disputed events, viewing the evidence in the light most favorable to him and giving him the benefit of all reasonable inferences. We do not, however, make any determination of any facts, even by implication. *See DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 611 (6th Cir. 2015).

## II.

At a little before 2:00 a.m. on Wednesday, February 25, 2015, a Metropolitan Nashville Police Department dispatcher broadcast a call that an alarm had sounded at the Club, indicating a break-in. After-hours break-ins at the Club are relatively common, hence the alarm and immediate call to the police, and the on-site surveillance cameras. Officer Bass, patrolling alone, was the first officer to respond and arrive at the scene. He immediately spotted Greve waiting outside the Club, in the walkway leading up the ramp the Club's front entrance. The temperature was well below freezing and Greve was coatless but wrapped in what turned out to be a tablecloth from the Club. Officer Bass noted that the Club appeared closed and there were no other people around. He

parked his patrol car near the front entrance and walked toward Greve. He could hear the Club's alarm sounding.

Greve was talking into his cell phone when Officer Bass arrived, leaving a voice mail for his employer, Jack Gavin, who Greve believed could help him get into the locked Club to retrieve his belongings. Greve ended his call and greeted Officer Bass warmly, walking toward him to meet him halfway, extending his hand for a handshake, introducing himself as Patrick, and explaining that he had been working at an event inside the Club, that his belongings were locked inside, and that the door handle fell off when he tried the door. Officer Bass did not respond to Greve's greeting. Instead, he immediately ordered Greve to turn around and put his hands against the wall, patted him down, and secured him with handcuffs, very tightly. Officer Bass did not say anything else. When Greve asked what was going on, Bass responded curtly that he was "detaining" him and began pushing Greve toward his patrol car. Officer Bass did tell Greve his name when Greve asked, to which Greve tried again: "I'm Patrick Greve. Let's treat each other like humans." Officer Bass continued to push Greve toward the patrol car, took Greve's cell phone from him, and shoved Greve into the patrol car without any further conversation. It is unclear whether merely pulling on the Club's locked door, even breaking the handle when doing so, would set off the alarm, or if an actual breach would be necessary, but Officer Bass did not question whether Greve had opened the door, set off the alarm, or entered the Club. Six other officers arrived at the scene, but none of them ever spoke with Greve. According to police records, Officer Bass arrived at the scene at 1:57 a.m. and formally arrested Greve at 2:53 a.m., so Greve sat in the patrol car for almost an hour.

As mentioned, Greve had been working at an event at the Club that night (the "Event") and was locked out with his belongings still inside, so he was waiting for someone to arrive and let

him in to get them. Jack Gavin had hired Greve as a videographer to document the day-to-day activities of a musician named Erica Nicole, leading up to and including the Event—an "album release party" with a small concert for "industry professionals to see her play." Gavin had picked up Greve at his home that morning and driven him to the Club where Greve spent the day helping Howard Bennett, Kendal Kramer, and Austin Rothrock, among others, assemble the stage and set up the equipment. Gavin drove Greve home in the afternoon so that Greve could clean up and drove him back to the Club by 5:00 p.m. so that Greve could film the Event, which ended sometime between 11:00 and 11:30 p.m., by the time Nicole, her entourage, and all the guests had left. Greve encountered Bulut several times throughout the evening and even tried to talk with him once, though Bulut was unreceptive. While filming the Event, Greve drank about one beer per hour— so five beers over five hours—and ate from the complimentary buffet. He was not drunk. At the end of the Event, Greve attempted to leave with Nicole in her tour bus, but Gavin told him to instead stay and help disassemble the stage and equipment and load it onto the truck. Rothrock attested that, while they were moving and packing this equipment, Greve "did not appear to be intoxicated or impaired in any way."

While Greve, Bennett, Kramer, and Rothrock were shuttling equipment to the truck, Bulut was pacing around impatiently. At about 1:00 a.m., after countless trips, they were almost finished and Greve was on his way back into the Club—and returning a Club tablecloth that had been used to cover some equipment—when Kramer and Rothrock discovered that the door they had been using was suddenly locked and they were locked out of the Club with their belongings still inside. Because they thought the lockout happened too fast for Bulut to have already left the premises, Kramer and Rothrock knocked at the door, shouted, and tried knocking at other doors. Meanwhile, Greve tried to call Gavin on his cell phone (nine times in all) and walked across the street to where

4

Gavin had parked his car, only to get no answer on the phone and discover that Gavin's car was gone. When Greve got back to the Club, the truck was gone (apparently Bennett drove it away) and Kramer and Rothrock were driving off too, but yelled to Greve that they had gotten into the Club and retrieved their belongings and that Greve could get in through the front door. When Greve tried the front door, however, "the handle fell off right in [his] hand," and the door remained locked. Greve picked up the pieces to the door handle and placed them to the side, and, using the tablecloth as a wrap to try to stay warm, continued to call Gavin and waited for someone to show up and let him into the Club. He could hear the alarm sounding inside the Club, but he was locked out and never got back inside. Unknown to Greve at the time, Kramer had used a piece of pipe to pry the front door open and gain entrance, breaking the door handle and setting off the alarm. In fact, Kramer had damaged at least two other doors in his attempt to gain access using the pipe.

Greve was relieved when Officer Bass arrived—hence the enthusiastic greeting—because he knew he "had done nothing wrong" and was waiting for someone to arrive and help him get his belongings: jacket, tie, dress shirt, wallet, keys, and his camera and lenses inside a camera bag. In fact, he knew exactly where they were located inside:

> I placed them with my camera bag near the back, what I would call the back door. There's a - - you can - - it rises up a bit to kind of a VIP section. There's some - - some kind of lounge areas there. That's where my stuff was, and most of the tech guys were there throughout the day.

But, as already discussed, Officer Bass chose to ignore Greve's plea for help, refusing to even speak with him, and rather than considering the facts and circumstances, he immediately handcuffed Greve—leaving the tablecloth on the ground where Greve had been waiting—and detained Greve in his patrol car. It had been over two hours since Greve had his last alcoholic drink. During his deposition, Officer Bass conceded that Greve was coherent and that he had no

trouble understanding what Greve was saying (but maintained that he did not recall anything Greve said to him before he placed Greve in handcuffs).

When Bulut arrived at the scene, he unlocked the Club's door and led Officer Bass, Officer Billy Price, and Sergeant Derek Keeler inside, where they inspected for damage related to the suspected break-in. Officer Price testified that he was not looking for Greve's belongings during the inspection, as no one had even described them to him, nor did he recall Officer Bass looking for them. And Bulut testified that he did not know they were looking for any of Greve's belongings in the Club. But, to the extent that anyone looked for Greve's belongings, Officer Bass testified that he was looking for a backpack, while Sergeant Keeler was looking for "[a] bag, or something like that, that didn't belong [in the Club,] that was noticeable to the manager [Bulut]." After the inspection of the Club, Officer Bass led Bulut back to his patrol car and shined his flashlight on Greve in the backseat. When Bulut denied knowing or recognizing Greve, and claimed that Greve had no reason to be inside the Club after hours, Bass told Greve that "he doesn't recognize you, none of your stuff is in the building[,] and he wants to press charges." Greve responded "right then" by asking if he could lead them inside and show them where his belongings were, but Bass said no. Some time later, Bass got into the car, told Greve that he was arresting him and taking him to detention, read him his *Miranda* rights, and engaged in a conversation with Greve, which Greve recounts as follows:

> There was a conversation when [Officer Bass] finally read the *Miranda* rights in the car where he asked me about a pry bar. And I started to get frustrated because, obviously, I was frustrated. I didn't know what was going on.
>
> And I told him to go find that crowbar and take some prints on it. I'd be happy to help out in whatever way. He said, what crowbar? I said, you said there was a crowbar. He says, no, I said there was a pry bar. To which I replied, now I feel like you're just being a jerk.
>
> Because this guy was just trying to instigate or provoke me. And that's how it seemed from the beginning, and I was losing my - - my cool about it.

6

When Bass threatened that fingerprints would be collected from the pry bar, Greve responded, "excellent," and implored Bass to "promise" that prints would be collected, to which Bass agreed. If fingerprints were collected, the results were not shared with Greve.

At the police station, Officer Bass swore out affidavits accusing Greve of attempted burglary, in violation of T.C.A. § 39-14-402, and public intoxication, in violation of T.C.A. § 39-17-310, and a reviewing judge made an after-the-fact determination of probable cause for both charges. Officers Bass and Price both completed incident reports.[1] In his arrest report, Officer Bass designated Bulut as the "prosecutor" of the charges against Greve, but he listed himself as the prosecutor and Bulut as the victim in the affidavits supporting the arrest warrant for the attempted-burglary charge against Greve. Officer Bass charged Greve with attempted burglary without ever watching the surveillance videos or speaking with anyone other than Bulut, such as anyone else at the Club. Greve spent about 12 hours in jail before being released on bond.

The following morning, when Jack Gavin finally received Greve's voicemails, he went to the Club and immediately spotted Greve's belongings "in plain view on a bench by the back door where the crew members had stored their things during the [E]vent," which was exactly where Greve had told Officer Bass they were located. Gavin opined: "I do not understand how police officers searching for [Greve]'s coat and other belongings the night before did not find them as quickly and easily as I did." A short time later, Gavin and Greve returned to the Club together and spoke with Ian Cushman, the IT manager at the Club, who told them that the surveillance videos

---

[1] Officer Price relied on statements that he attributed to Bulut, reporting: "[Bulut] is the manager at the location. He states the restaurant closed at around 10pm and he believed all the employees of the photography company left around the same time. [Bulut] stated the items inside belonged to the photography company who previously agreed to pick them up the following day. [Bulut] stated the suspect [Greve] did not look familiar and did not have access to the location. [Bulut] states there is video footage but he would not have access to it until the following day." Note that "the photography company" was Greve and two people working for him; Bulut did not corroborate any of this; and Office Bass made no mention of any surveillance video.

had recorded Kramer ("your drum tech") breaking into the Club, and that someone else (Greve) was also evident later in the video as "someone in a cape," meaning the tablecloth. Gavin and Greve spotted Bulut while on their way inside the Club to meet with Sean Austin, the Club's General Manager; Austin "said that he would go get [Bulut], and then he came back minutes later and he said that Oleg [Bulut] was not there," so they felt Bulut was "dodging" them. Nevertheless, Austin confirmed Ian Cushman's story about the surveillance videos and told them that Kramer had broken three handles off two other doors before breaking in through the front door. Austin promised to set up a meeting with Bulut to clear up any misunderstanding, but that never happened. Austin testified that, despite his possession of the surveillance video and his awareness that Greve was innocent, he did not have authority to drop the charges; someone higher up at MSEG would have to do that. Despite Greve's and his counsel's persistence, MSEG refused to provide Greve any assistance.

The prosecutor pursued the case, causing Greve to appear in court at least three times but, eventually, the Davidson County (Tenn.) Court of General Sessions dismissed the charges without trial, ending the proceedings. Greve had to borrow money from his parents to pay his bond and hire a criminal defense attorney, and for each of his appearances in court before the dismissal, he had to travel from Cincinnati, Ohio, to Nashville, Tennessee.

Greve sued in federal court, raising claims against several defendants, though only four claims remain: that Officer Bass committed false arrest and malicious prosecution in violation of the Fourth Amendment, and that Bulut and MSEG committed malicious prosecution in violation of Tennessee law. Following discovery, the three defendants moved for summary judgment, with Officer Bass claiming qualified immunity based on his view of probable cause for the arrest and prosecution; and Bulut and MSEG claiming they were not liable for the criminal prosecution.

8

One aspect of discovery, in particular, warrants mention. From his deposition testimony, Officer Bass would appear to be either mentally deficient or dishonest. So many of his answers were some variation of "I don't recall," "I don't know," or "I don't understand the question," that far fewer than half of the questions resulted in actual answers (though, tellingly, he answered all of his own counsel's questions substantively, never once claiming that he didn't recall, didn't know, or didn't understand the question). When Officer Bass did answer Greve's counsel's questions, his answers were often inconsistent or disputed, and were occasionally suspicious. The most egregious example of this is his accusation—refuted by Greve and wholly unsubstantiated by any of the other officers present at the scene or the evidence collected in connection with this case—that when Officer Bass arrived at the scene, Greve was holding in his hand a drinking glass containing an alcoholic beverage:

> Question: Describe for me what Mr. Greve did to lead you to conclude that he was a danger to himself?
>
> . . .
>
> Officer Bass: Wearing the poncho, cold at night, impaired, under the influence of alcohol.
>
> Question: Anything else?
>
> Officer Bass: I believe he had a glass in his hand.
>
> Question: You believe he had a glass in his hand?
>
> Officer Bass: Of alcohol.
>
> Question: A glass of alcohol in his hand?
>
> Officer Bass: I believe so.
>
> Question: Okay. Did you take it from him?
>
> Officer Bass: I don't recall.
>
> Question: So you didn't test what was in there?
>
> Officer Bass: No.
>
> Question: Do you know what kind of glass it was? Was it a paper cup or an actual glass glass?
>
> Officer Bass: I think it was a short glass glass.

> Question: Made of glass?
>
> Officer Bass: Yes.

Greve denied this, no other officer could corroborate this, and no such drinking glass was reported by anyone as having been present at the scene. Later in that same deposition, the questioning returned briefly to this issue, and Officer Bass testified:

> Question: Officer Bass, I want to go back to the testimony you gave that, when you first approached Mr. Greve, he was holding a glass in his hand. . . . What is your testimony about what was in that glass?
>
> Officer Bass: Can we go back and look?
>
> Question: I'm not really in favor of going back and looking. As you sit here now, do you remember?
>
> Officer Bass: I don't recall the answer I gave you previously.
>
> Question: Okay. So do you recall whether you investigated what was in that glass?
>
> Officer Bass: I don't know.
>
> Question: Did you smell what was in the glass?
>
> Officer Bass: I don't know.
>
> Question: Can you tell me what you did with the glass?
>
> Officer Bass: No.
>
> Question: Can you tell me if any report you ever wrote makes reference to that glass?
>
> Officer Bass: I don't know.
>
> Question: Well, let's go to . . . the affidavits that you filed for charging the crimes. And take a look at both of them, but in particular, the one for public intoxication would seem to be most relevant.
>
> Is there any reference to Mr. Greve holding a glass in any of those affidavits?
>
> Officer Bass: No.

To be sure, we do not decide questions of witness credibility on appeal, nor does the district court do so at the summary-judgment stage of the proceedings. And it is possible that Officer Bass might be more forthcoming when testifying at trial and a jury might believe him (in spite of the likely impeachment arising from his deposition testimony). But at this stage, we must determine

whether disputes of fact are *genuine*, and we are loath to credit Officer Bass's deposition testimony about even undisputed issues, much less disputed issues.

The district court, on the other hand, considered this same evidentiary record—including this same deposition testimony—and accepted Officer Bass's version of several disputed material facts in order to find probable cause and grant him summary judgment. *Greve v. Bass*, No. 3:16-cv-0372, 2018 WL 4254650, at *4 (M.D. Tenn. Sept. 6, 2018). The first issue in this appeal concerns the district court's grant of summary judgment despite Greve's claim that there remain genuine disputes of material fact that should be submitted to a jury.

## III.

The district court granted the defendants' motions for summary judgment by finding that Officer Bass had probable cause for Greve's arrest and that Bulut and MSEG did not cause Greve's criminal prosecution. In finding probable cause, the district court said: "Here, the Court finds Officer Bass detained [Greve] based on the reasonable suspicion that criminal activity had occurred or was imminent based on the activated alarm, broken door handle, and [Greve's] standing outside the Club *without an articulate reason to be at the Club*. (Bass Depo. at 16)." *Greve*, 2018 WL 4254650, at *4 (emphasis added). Whether Greve had "an articulate reason to be at the Club" is not merely a material fact—particularly given the district court's reliance on it—it is *the most disputed material fact* of the entire case: Greve says that he told Bass that, while working at the Event at the Club, he was locked out while his belongings remained inside the Club and was waiting for someone to let him in to get his belongings, that he knew exactly where they were located inside the Club, and that he could readily lead or direct Bass there. Greve's contention is that Bass refused to hear any of this, ignored all the exonerating facts and circumstances (such as Greve's waiting in the freezing cold while the alarm sounded and then

11

greeting Bass enthusiastically on arrival rather than fleeing the scene when the alarm sounded), and undertook no investigation whatsoever. It is telling that, in recounting Greve's version of events, the district court began every sentence with the qualifier "Plaintiff argues" or "Plaintiff asserts," and then cited to Bass's deposition for its determinative facts. *Id.* The only way to read this is that the district court chose to decide the disputed facts for itself by crediting Bass's testimony over Greve's testimony and improperly deciding the facts in a manner that favored Bass.

In finding that Bulut and MSEG had not instituted or caused Greve's prosecution, the district court found that: "summary judgment is appropriate for [Greve]'s malicious prosecution claim because the record reflects Mr. Bulut simply provided an accounting of the facts within his knowledge, in good faith to Officer Bass . . . [and] Bass acted on his own to determine whether or not there should be a criminal prosecution." *Id*. at *5. But the record does not reflect this inference or determination, particularly when viewed in a manner favoring non-movant Greve.

When viewing the facts in the light most favorable to Greve, the record shows that Bulut told the officers: (1) the Club closed at 10:00 p.m., at which time Bulut "personally saw all the items and personnel out of the [Club]"; (2) any items left inside the Club belonged to "the photography company," which had "previously agreed to pick them up the next day"; (3) Bulut did not recognize Greve and Greve was not authorized to be in the Club; and (4) Bulut wanted to press charges against Greve. First, the timing of Bulut's departure and lockup of the Club is disputed: Greve testified that he, Kramer, and Rothrock were still loading equipment out of the Club until approximately 1:00 a.m. when Bulut locked them out with their belongings still inside, which is supported by Rothrock's sworn statement that they were locked out of the Club sometime after midnight. Second, whether Greve's belongings were inside the Club is not disputed, as Jack Gavin quickly found them the day after Greve's arrest, precisely where Greve said they were

12

located.  Third, whether Bulut recognized Greve while Greve was sitting in the back of the patrol car is disputed: at his deposition, Bulut testified that when he saw Greve in the patrol car he "recognized him as being there [at the Club] that night."  This directly contradicts Officer Price's report that Bulut did not recognize Greve.  Finally, Greve clearly disputes that Officer Bass "acted on his own" without regard to Bulut.  Even Bass testified that he did not know if he would have had probable cause without Bulut's statements.  Again, the only way to read the district court's analysis of the facts is that it chose to decide the dispute itself (in a way that favored Bass and Bulut) rather than view the facts in Greve's favor, as is required.

Finally, in a footnote, the district court opined: "Because [Greve] admits to breaking the door of the Club and was found by Officer Bass standing by the broken door, Officer Bass had probable cause to arrest [Greve] for vandalism.  However, given the Court's other holdings herein, this determination does not impact the outcome of this case."  *Id*. at *3 n.5 (citation omitted).  But Greve did not admit to breaking the door of the Club; he repeatedly denied it, claiming that the handle was already broken and merely fell off.  And Greve was not standing by the broken door when Officer Bass arrived; nobody—not even Bass—ever asserted that.  The district court expressly excluded this from its decision, but it is further demonstration of the court's willingness to find—and even create—facts for itself when deciding summary judgment.

On summary judgment, it is improper for the district court to construe evidence and testimony in a way that favors the moving party.  *See Baker*, 936 F.3d at 529.  Here, for whatever reason, the district court went beyond that and constructed a version of events that even the moving parties had not alleged.  The district court's grant of summary judgment was improper.

**IV.**

Officer Bass invokes qualified immunity for the false-arrest and malicious-prosecution claims. Qualified immunity shields government officials in the performance of discretionary functions from standing trial for civil liability unless their actions violate clearly established rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The plaintiff in a 42 U.S.C. § 1983 action against such an official bears the burden of overcoming the qualified-immunity defense. *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 681 (6th Cir. 2013). At the summary-judgment stage, the plaintiff must show that (1) the defendant violated a constitutional right and (2) the right was clearly established. *Id*. at 680. At a minimum, this requires evidence of a "genuine issue of fact"; that is, "evidence on which [a] jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

**A.**

Greve contends that Officer Bass acted without probable cause, thus violating his clearly established right to be free from arrest or prosecution without probable cause. *See Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003) ("[I]t is well established that any arrest without probable cause violates the Fourth Amendment."). "Moreover, the law has been clearly established since at least the Supreme Court's decision in *Carroll v. United States*, 267 U.S. 132, 162 (1925), that probable cause determinations involve an examination of all facts and circumstances within an officer's knowledge at the time of an arrest." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 310 (6th Cir. 2005) (emphasis, editorial marks, and quotation marks omitted). We have elaborated on this requirement repeatedly, to the effect that:

> Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed. The inquiry depends upon the reasonable conclusion to be drawn from the facts known to the arresting

officer at the time of the arrest where supported by reasonably trustworthy information.

No overly-burdensome duty to investigate applies to officers faced with the prospect of a warrantless arrest. In initially formulating probable cause, they need not investigate independently every claim of innocence. And after the officer determines, on the basis of the facts and circumstances known to him, that probable cause exists, the officer has no further duty to investigate or to search for exculpatory evidence.

However, the initial probable cause determination must be founded on both the inculpatory *and* exculpatory evidence known to the arresting officer, and the officer cannot simply turn a blind eye toward potentially exculpatory evidence. In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible.

*Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007) (quotation marks and citations omitted; paragraph breaks inserted); *accord Courtright v. City of Battle Creek*, 839 F.3d 513, 521 (6th Cir. 2016); *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015); *Radvansky*, 395 F.3d at 305.

In *Radvansky*, 395 F.3d at 306-07, we questioned the officers' claim of probable cause, pointing out that they "received an unusual call[,] which was sufficient to put both officers on notice that this was an atypical burglary situation"; they "ignored Radvansky's repeated protestations that he had a right to be on the premises"; and, "despite Radvansky's repeated statements about having possessions and furniture in the house, no police officer investigated this claim." Here, when Officer Bass responded to the alarm signaling a break-in at the Club, Greve, who had been waiting in the cold, walked over to greet him, extended his hand for a handshake, and introduced himself—this should have put Bass on notice that this was an atypical burglary situation. Similarly, Bass ignored Greve's protestations that he just needed someone to let him into the Club so that he could retrieve his belongings and, despite his explanation that his belongings were inside, no officer legitimately investigated that claim.

When the officers in *Radvansky*, 395 F.3d at 309, argued "that evidence of the forced entry . . . was sufficient by itself to establish probable cause," we held that it was "sufficient to create

15

reasonable suspicion" and justify detention of "the suspect briefly to investigate the suspicious circumstances," but "the officers did not investigate any further." "As a result, the reasonable suspicion which justified their initial actions never matured to probable cause of wrongdoing, which is necessary to support a full-fledged arrest." *Id*. at 310. Here, Officer Bass did not even have the quantity or quality of reasonable suspicion that had justified the suspect's detention in *Radvansky*: Bass responded to a dispatch, heard an alarm sounding from within building, and encountered an eager potential witness in Greve. Bass immediately detained Greve, before he observed the broken door handle, questioned Greve, or even determined what was going on. Even in his post-hoc explanation at his deposition, Bass's reasons for the detention were dubious or—as with the claim that "I believe he had a glass in his hand"—suspiciously contrived. But even if we assume that Bass had reasonable suspicion to detain Greve initially, he never investigated at all the potentially exculpatory evidence or explanation that Greve had explicitly called to his attention, so that suspicion could not mature into probable cause for arrest.

In *Logsdon*, 492 F.3d at 342, we questioned the claim of probable cause and criticized the officer because, "[u]pon arriving at the scene, [Officer] Hains refused to listen to an eyewitness account of the incident." Here, where Greve was the only eyewitness to the events before Officer Bass's arrival, Bass refused to listen to Greve's explanation of the circumstances. In fact, he refused to listen to anything Greve had to say, even his self-introduction. Had Bass asked Greve to produce identification, Greve would have explained—again—that his wallet was locked inside the Club, along with his other belongings, thus causing his predicament.

In *Wesley*, 779 F.3d at 431, we explained that "the implausibility of a witness's accusations is also germane to determining the existence of probable cause." Here, the only witness accusation was Bulut's claim that he did not recognize Greve, which, if not implausible, was certainly

16

irreconcilable with Greve's explanation, had anyone listened to it. That is, Greve certainly recognized Bulut and, had Greve been asked or permitted to speak, he would have identified Bulut by name and that Bulut was the Club's night manager who had locked him out. Moreover, the attempted-burglary theory itself was implausible: supposedly Greve either failed to get inside the Club or, alternatively, went inside the Club and stole only a tablecloth; then, while the alarm sounded, he wrapped himself in the tablecloth and waited outside in freezing temperatures for a police officer to arrive; then he greeted the responding officer enthusiastically with a handshake and an introduction.

In *Courtright*, 839 F.3d at 522, we explained that "we ha[d] not found any precedential case in which we concluded that a phone call, without any corroborating information, provided *probable cause* for arrest." Here, Officer Bass did not even have a complaining witness or an accusation; Officer Bass responded to a dispatch and seized, detained, and arrested the first person he encountered at the scene, without considering the circumstances, listening to that person's (Greve's) explanation, or conducting any further investigation into the situation. As it happens, Greve knew how the alarm had been set off (and who did it) and was waiting outside the Club in the hope that someone would arrive who could let him in to get his belongings. But Bass did not know that and, in fact, refused to know. Had it been someone other than Greve standing outside the Club—e.g., a distressed victim from another crime, Jack Gavin responding to Greve's voice mails, Bulut or another Club manager, or even a federal judge—Officer Bass, under his theory of probable cause, would have seized, detained, and arrested that person without considering the circumstances, listening to any explanation, or conducting any further investigation. That is the antithesis of probable cause.

17

To be clear, it is not farfetched to speculate that a suspicious officer would have—after establishing that Greve was not at physical risk from the cold—asked Greve some questions, such as: "Why are you here and what's going on?", "Do you have any identification?", "If you didn't break the door handle and set off the alarm, do you know who did?", "Is there anyone inside?", "Is there anyone who can confirm your story?", "The manager says he doesn't recognize you—do you recognize him?" But we do not imply that Officer Bass was required to ask such questions or that his failure to do so necessarily violated Greve's rights. Rather, we hold that, in deciding whether he had probable cause to arrest (and recommend prosecution of) Greve, Bass was required to consider all of the facts and circumstances readily and reasonably within his knowledge, *see Radvansky*, 395 F.3d at 310; *Logsdon*, 492 F.3d at 341, and that his failure—actually *refusal*—to do so in this case, if proved at trial, would be a violation of Greve's rights.

**B.**

Officer Bass argues that the reviewing judge's after-the-fact endorsement of his arrest-warrant affidavits establishes that he had probable cause. We disagree. Simply put, an after-the-fact determination, be it by warrant or indictment, does not pro forma "serve to validate a prior arrest." *Radvansky*, 395 F.3d at 307 n.13 (citing cases). Moreover, "[p]olice officers cannot, in good faith, rely on a judicial determination of probable cause when that determination was premised on an officer's own material misrepresentations to the court." *Gregory*, 444 F.3d at 758; *see also Sykes*, 625 F.3d at 310 n.8. Greve contends that Bass made material misrepresentations in the warrant affidavits and, regardless of whether Greve is correct, as we have already explained, Greve has created a genuine dispute of material fact on this question, which settles this in his favor.

18

### C.

Officer Bass argues that the Supreme Court's recent opinion in *District of Columbia v. Wesby*, 583 U.S. - -, 138 S.Ct. 577 (2018), overcomes our precedent or has changed the law. We disagree. The Court in *Wesby* considered whether police officers responding to partying and loud music at a vacant home had probable cause to arrest the partygoers, and whether the officers were entitled to qualified immunity because they "reasonably but mistakenly conclude[d] that probable cause [wa]s present." *Id*. at 591. Officer Bass emphasizes the Court's conclusion that "[t]here was no controlling case holding that a bona fide belief of a right to enter defeats probable cause, that officers cannot infer a suspect's guilty state of mind based on his conduct alone, or that officers must accept a suspect's innocent explanation at face value." *Id*. at 593.

But *Wesby* is distinguishable. The *Wesby* Court stressed that "probable cause deals with probabilities and depends on the *totality of the circumstances*," *id*. at 586 (quotation marks and citations omitted, emphasis added), and pointed to the partygoers' "reaction to the officers" as a basis for the officers to believe that the partygoers knew that they had no right to be in the house: "A reasonable officer could infer that the partygoers' scattering and hiding was an indication that they knew they were not supposed to be there." *Id*. at 587. Greve, on the other hand, did nothing overtly incriminating. Quite the contrary, Greve waited near the Club's entrance, in the frigid cold, for the police—or someone, anyone—who could let him inside. And, despite the sounding security alarm and the broken door handle—Greve enthusiastically approached and greeted Officer Bass's arrival, introducing himself and making every effort to explain what had occurred.

But even if our facts were on point, *Wesby* emphasized that we review the officer's probable cause determination under the totality of the circumstances, not by looking at each fact "standing alone." *Id*. at 588. Officer Bass would have us consider only his preferred facts and

disregard the rest, ignoring the totality of the other circumstances, such as Greve's proffered explanation and attempt to cooperate. But *Wesby* emphatically rejected such an approach:

> First, the panel majority viewed each fact in isolation, rather than as a factor in the totality of the circumstances. This was mistaken in light of our precedents. The totality of the circumstances requires courts to consider the whole picture. Our precedents recognize that the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation. Instead of considering the facts as a whole, the panel majority took them one by one. . . .
>
> Second, the panel majority mistakenly believed that it could dismiss outright any circumstances that were susceptible of innocent explanation. . . . But probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts. As we have explained, the relevant inquiry is not whether particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of noncriminal acts. Thus, the panel majority should have asked whether a reasonable officer could conclude—considering all of the surrounding circumstances, including the plausibility of the explanation itself—that there was a substantial chance of criminal activity.
>
> . . . The panel majority identified innocent explanations for most of the[] circumstances in isolation, but again, this kind of divide-and-conquer approach is improper. A factor viewed in isolation is often more readily susceptible to an innocent explanation than one viewed as part of a totality. And here, the totality of the circumstances gave the officers plenty of reasons to doubt the partygoers' protestations of innocence.

*Id*. at 588-89 (quotation marks and citations omitted). Thus, in *Wesby*, the individual facts were "susceptible to innocent explanation," whereas the totality of facts and circumstances supported a finding "that there was a substantial chance of criminal activity." *Id*. Here, even the individual facts did not demonstrate probable cause, but supposing some of them had, we would nonetheless be left with the inescapable conclusion that the *totality* of facts and circumstances did not reasonably support a substantial likelihood that Greve had committed a crime.

A correct application of *Wesby* neither affects our precedent nor changes our analysis. Officer Bass's refusal to consider the totality of facts and circumstances undermines his contention

that he had probable cause to arrest Greve. That refusal, if proven at trial, would be a violation of Greve's rights.

## V.

Bulut and MSEG claim that Greve's evidence cannot satisfy the elements of malicious prosecution under Tennessee state law because they did not "institute" the prosecution.

> Under Tennessee law, a person who procures a third person to institute criminal proceedings against another may be liable for malicious prosecution as if he had actually initiated the proceedings. . . . [W]hile it is not necessary that a person actually swear out the warrant to be liable for malicious prosecution, something more than merely giving information must be shown.
>
> With respect to the giving of information, . . . one who causes another's prosecution by false statements or misrepresentations may be liable for malicious prosecution, even if he does not file a complaint or actually procure the prosecution. On the other hand, when a person discloses in good faith all facts within his knowledge having a material bearing on the question of the guilt of the person suspected and leaves it to the officer to act entirely on his own judgment and responsibility as a public officer as to whether or not there shall be a criminal prosecution, he is not liable in an action for malicious prosecution.

*Trice v. McEachen*, 772 F. Supp. 2d 903, 912-13 (M.D. Tenn. 2011) (quotation marks, editorial marks, citations, and footnotes, and emphasis omitted).

Greve contends that, while he sat in the police car, it was Bulut who "instituted" the prosecution against him by instructing Officer Bass that he (and the Club) wanted to press charges for attempted burglary. Moreover, once the prosecution was underway, MSEG was fully aware of Greve's innocence based on evidence in its exclusive possession—namely, the surveillance video—but deliberately refused to help Greve by sharing that exonerating evidence.

During discovery, Sean Austin, the Club's General Manager, said he was powerless to help Greve, but had turned the matter over to his superiors. And Bulut testified that he attended a management meeting at which those superiors discussed the matter. But Daniel Leverett, MSEG's Rule 30(B)(6) witness and one of two principals in the MSEG corporation, testified that he was

21

not told about the incident until Greve filed this lawsuit two years later. On whole, there is no evidence that anyone at MSEG took any action to reveal Greve's innocence, despite their knowledge of it.

More to the point, there is evidence that Bulut instructed Officer Bass that he (and, at least by implication, the Club) wanted to prosecute Greve, including Bass's initial arrest report that named Bulut as the prosecutor; Bass testified that he was unsure if he would have had probable cause to pursue prosecution of Greve without Bulut; and there is no evidence that anyone at MSEG ever told the police or prosecutor that they did *not* want to prosecute Greve or revealed that they knew Greve was innocent based on their surveillance video.

We cannot conclude at this stage of the proceedings that Bulut or MSEG had "disclose[d] in good faith all facts within [their] knowledge having a material bearing on the question of the guilt of the person suspected." *See Trice*, 772 F. Supp. 2d at 913. Therefore, a jury could find from the evidence available that Bulut and/or MSEG instituted and furthered the prosecution of Greve so as to hold them liable for malicious prosecution. Summary judgment is inappropriate.

## VI.

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

GRIFFIN, Circuit Judge, concurring in part and dissenting in part.

I agree with the majority opinion that the district court erred by granting summary judgment in favor of defendants Bulut and MSEG with respect to the claims for malicious prosecution under Tennessee law. However, I respectfully dissent regarding the reversal of the grant of summary judgment in favor of Officer Bass. In my view, Bass had reasonable suspicion to initially detain Greve and probable cause to arrest him. I would therefore affirm the grant of summary judgment in favor of Bass on the basis of qualified immunity.

I.

The majority abruptly concludes that Officer Bass did not have reasonable suspicion to initially detain Greve.[1] I disagree.

Reasonable suspicion is not a demanding standard. It "requires more than just a 'mere hunch,' but is satisfied by a likelihood of criminal activity less than probable cause, and 'falls considerably short of satisfying a preponderance of the evidence standard.'" *Smoak v. Hall*, 460 F.3d 768, 778 (6th Cir. 2006) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). An officer simply must have "a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Ellis*, 497 F.3d 606, 613 (6th Cir. 2007) (quoting *Arvizu*, 534 U.S. at 273).

We look at the totality of the circumstances to determine whether an officer had reasonable suspicion to conduct a *Terry* stop. *Id.* This requires "determin[ing] whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001). "Pertinent circumstances include the officer's own direct observations,

---

[1] Thus, the majority opinion seems to implicitly (and correctly) reject Greve's argument that his initial detention was actually an arrest, which would require a showing of probable cause. *See Brown v. Lewis*, 779 F.3d 401, 414 (6th Cir. 2015).

dispatch information, directions from other officers, and the nature of the area and time of day during which the suspicious activity occurred." *United States v. Campbell*, 549 F.3d 364, 371 (6th Cir. 2008). We also "must bear[ ] in mind that officers are permitted 'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them.'" *Green v. Throckmorton*, 681 F.3d 853, 860 (6th Cir. 2012) (quoting *Ellis*, 497 F.3d at 613).

A.

Officer Bass had reasonable suspicion that Greve had committed the crime of public intoxication, a charge that the majority opinion barely mentions. In Tennessee, public intoxication occurs when a person "appears in a public place under the influence of a controlled substance, controlled substance analogue or any other intoxicating substance to the degree that [t]he offender may be endangered; [t]here is endangerment to other persons or property; or [t]he offender unreasonably annoys people in the vicinity."[2] Tenn. Code Ann. § 39-17-310(a).

Upon encountering Greve, Bass "observed [Greve] to have watery, bloodshot eyes and the odor of alcohol about his person." These are classic indicators of alcohol intoxication. *State v. Montgomery*, 462 S.W.3d 482, 488 (Tenn. 2015); *see State v. Bell*, 429 S.W.3d 524, 532–34 (Tenn. 2014) (collecting and discussing cases in DUI context). Moreover, Bass found Greve in an alleyway (i.e., a public place) outside an establishment that serves alcoholic beverages, further strengthening the suspicion that Greve was intoxicated. And Greve does not dispute these facts;

---

[2]"'Public place' means a place to which the public or a group of persons has access and includes, but is not limited to, highways, transportation facilities, schools, places of amusement, parks, places of business, playgrounds and hallways, lobbies and other portions of apartment houses and hotels not constituting rooms or apartments designed for actual residence. An act is deemed to occur in a public place if it produces its offensive or proscribed consequences in a public place." Tenn. Code Ann. § 39-11-106(a)(31).

24

he testified at his deposition that he drank five alcoholic beverages earlier in the evening—"Bud Lights and some wine towards the end of the night."

Greve's presence outside, alone, inadequately dressed for the cold weather, and wearing a tablecloth for warmth, indicated that he "may be endangered" on account of his intoxication. Tenn. Code Ann. § 39-17-310(a). "[W]hile most people can be expected to navigate cold weather to find an indoor shelter, an intoxicated person may lack this capacity." *Gladden v. Richbourg*, 759 F.3d 960, 966 (8th Cir. 2014). "Weather that would not be dangerous to a properly dressed and sober individual can become dangerous when that person is intoxicated." *United States v. Gilmore*, 776 F.3d 765, 772 (10th Cir. 2015). This is especially so if the intoxicated person is by himself. Again, Greve admits that he was alone, that it was cold outside, that he himself was cold, and that he wrapped himself in a tablecloth.

These facts establish that reasonable suspicion supported Greve's detention in the back of a squad car while Officer Bass investigated whether Greve had committed the crimes of public intoxication or attempted burglary. If reasonable suspicion for one offense exists, "it does not matter that the officer was motivated by a belief that a different offense (even one for which there was not reasonable suspicion) had been committed." *United States v. Winters*, 782 F.3d 289, 303 (6th Cir. 2015) (citation omitted); *see Whren v. United States*, 517 U.S. 806, 812–13 (1996). An officer's investigation for that offense need only "be 'reasonably related in scope' to the factual basis underlying the finding of reasonable suspicion." *Winters*, 782 F.3d at 304 (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). Here, the circumstances indicated that the two suspected offenses—public intoxication and attempted burglary—occurred in the same location and during the same time period, which satisfies this standard. *Cf. id.* at 303–04 ("An officer who pulls over and questions an erratic driver whom he reasonably believes to be intoxicated, for example, cannot, on

25

that basis alone, investigate the driver for securities fraud."). Thus, whether Officer Bass reasonably suspected Greve of attempted burglary at the time of the investigative detention is only one part of the analysis here. The majority opinion fails to acknowledge this precedent and offers no explanation for why it should not apply in this case.

B.

Irrespective of the public intoxication charge, Officer Bass had reasonable suspicion that Greve had committed the crime of attempted burglary. For our purposes here, attempted burglary in Tennessee occurs when a person, "without the effective consent of the property owner," attempts to enter "a building other than a habitation (or any portion thereof) not open to the public, with intent to commit a felony, theft or assault." Tenn. Code Ann. § 39-14-402(a); *see* Tenn. Code Ann. § 39-12-101.

Officer Bass arrived at the scene because a burglary alarm had sounded at the club. In the context of a warrantless search of a home, we have noted that "a recently activated burglar alarm is particularly pertinent to the probable cause determination." *United States v. Brown*, 449 F.3d 741, 749 (6th Cir. 2006). That's true for the reasonable suspicion analysis here, too. After all, "[t]he purpose of a security alarm is to alert police to problems so they can quickly respond to the premises." *Id.* Courts have long recognized that a security alarm going off is a relevant indicator that a burglary may be in progress or recently completed. *See Crock v. Pennsylvania*, 397 F. App'x 747, 749 (3d Cir. 2010); *United States v. Cohen*, 481 F.3d 896, 899 (6th Cir. 2007) (discussing *United States v. Moore*, 817 F.2d 1105, 1106 (4th Cir. 1987)); *United States v. McCullough*, 457 F.3d 1150, 1164 (10th Cir. 2006); *United States v. Tibolt*, 72 F.3d 965, 970 (1st Cir. 1995). Persons who have permission to access a building or vehicle generally know how to do so without setting off its burglary alarm.

Additionally, the incident occurred at two o'clock in the morning. Such a "late hour can contribute to reasonable suspicion." *United States v. Blair*, 524 F.3d 740, 751 (6th Cir. 2008). This has special import for the charge of burglary, which was defined at common law to only occur "in the nighttime." *Taylor v. United States*, 495 U.S. 575, 580 n.3 (1990). In this case, it was so late that the club was closed to the public. And when Officer Bass arrived, he found Greve, who was the only person around, in an alleyway near the premises. Upon first encountering Officer Bass, Greve "told him that the door had fell off when [Greve] went to pull on it." Greve's deposition makes clear that he made this statement—admitting to attempting to gain entry into the building—before Officer Bass detained him. Thus, the majority's statement that "Bass immediately detained Greve, before he observed the broken door handle, questioned Greve, or even determined what was going on" is incorrect.

To summarize, a police officer responding to a burglary alarm at two o'clock in the morning arrived at a dark, desolate, locked nightclub to find a single person there, who admitted to attempting to enter the premises. In my view, these facts satisfy the low bar of reasonable suspicion.

## II.

Officer Bass had probable cause to arrest Greve on the charge of attempted burglary. "Probable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). It "does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Crockett v. Cumberland Coll.*, 316 F.3d 571, 582 (6th Cir. 2003)

(quoting *Adams v. Williams*, 407 U.S. 143, 149 (1972)). A probable cause determination "must be founded on both the inculpatory and exculpatory evidence known to the arresting officer," *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007) (emphasis, citation, and internal quotation marks omitted), and must be supported by "reasonably trustworthy information," *Beck v. Ohio*, 379 U.S. 89, 91 (1964). "No overly-burdensome duty to investigate applies to officers faced with the prospect of a warrantless arrest. In initially formulating probable cause, they need not investigate independently every claim of innocence." *Logsdon*, 492 F.3d at 341 (citation and internal quotation marks omitted).

The most important factor in support of probable cause here is Oleg Bulut's statement to Officer Bass. As the majority opinion recounts,

> Bulut told the officers: (1) the Club closed at 10:00 p.m., at which time Bulut "personally saw all the items and personnel out of the [Club]"; (2) any items left inside the Club belonged to "the photography company," which had "previously agreed to pick them up the next day"; (3) Bulut did not recognize Greve and Greve was not authorized to be in the Club; and (4) Bulut wanted to press charges against Greve.

As it turns out, these statements were largely false. But Bass did not know that at the time. At the scene, they provided strong evidence that Greve's attempted entry into the building was unauthorized, and also directly contradicted Greve's statements that he knew Bulut and had a legitimate reason to be at the club.

The cases the majority opinion cites do not support its conclusion that probable cause was lacking here. First, in *Radvansky*, the police officers had much more information indicating that Radvansky had a right to be on the premises (the house at which he was renting a room), separate and apart from his own statements. *Radvansky v. City of Olmsted Falls*, 395 F.3d 291 (6th Cir. 2005). They "knew the following five facts" before responding to the call:

(i) that there was a dispute between the homeowner and someone who had lived at the residence; (ii) the dispute was over money and the right to live there; (iii) the person still had furniture and personal possessions in the house; (iv) the person had brazenly attempted to break into the house the night before; and (v) the same person had returned on this night.

*Id.* at 306. And once they arrived at the scene, the officers "dismissed the undisputed documentary evidence which corroborated Radvansky's claim." *Id.* The driver's license the officers found in Radvansky's wallet listed the house's address as his residence, the police dispatcher told the officers that a search of Radvansky's social security number returned his name and that same address, and a "police print-out also reflected Radvansky's address as the same." *Id.* at 307. Radvansky attempted to show the officers a note written by his landlord stating that Radvansky owed him rent, but "[t]he officers refused to look at it." *Id.* at 306.

By contrast, before responding to the call here, Officer Bass had no prior knowledge about Greve's work at the club earlier in the evening, and was presented with no "undisputed documentary evidence" at the scene corroborating Greve's story. Greve told Bass that his belongings were still inside the club, but Bass did not "refuse to look at" them. Nor did he refuse to look for them. When the officers walked through the inside of the club, Bass testified that he was looking for "a backpack," while Sergeant Keeler testified that he was looking for a "bag, or something like that, that didn't belong [there and] was noticeable to [Bulut]." But at his deposition, Greve described the bag as a "camera bag . . . about the size of a pro football." Greve's statement that his belongings were inside is different in kind from the multiple sources of physical evidence the officers in *Radvansky* had literally in front of their faces and chose to ignore.

The majority opinion also cites *Logsdon* because the officer in that case "refused to listen to an eyewitness account of the incident." 492 F.3d at 342. But critically, the witness there was not the person suspected of criminal wrongdoing. *See id.* at 338. As discussed above, Officer

29

Bass already had reasonable suspicion that Greve had engaged in criminal activity, and Bass did credit the statements of the only eyewitness who was not a criminal suspect: Oleg Bulut. Indeed, it is still unclear why Bulut chose to lie to the officers. "Once probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused." *Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir. 1999). "In fact, law enforcement is under no obligation to give any credence to a suspect's story or alibi nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause." *Id.* (brackets, citation, and internal quotation marks omitted). Here, Bulut's statement, combined with the facts discussed above— like the damage to the building and Greve's admission that he had attempted to enter the premises—provided probable cause to arrest Greve. Bass was not required to investigate further once probable cause was established.

Finally, the majority opinion cites *Wesley* for the proposition that "the implausibility of a witness's accusations is also germane to determining the existence of probable cause." *Wesley v. Campbell*, 779 F.3d 421, 431 (6th Cir. 2015). But the mere fact that Bulut's statements conflicted with Greve's story does not make those "allegations . . . unlikely." *Id.* And the odd theory of burglary the majority spells out does not come close to being "implausible," especially given Bass's knowledge of Greve's intoxication. Intoxication often leads to unusual behavior.

Ultimately, the majority faults Officer Bass for not crediting the story of a visibly intoxicated man wrapped in a tablecloth over the club manager who had no apparent reason to lie. Bulut (and his employer, via respondeat superior liability) should be made to answer for his false statements and his decision to press charges against a man he knew had reason to be at the club. The police officer who relied on those statements in good faith should not.

III.

For the reasons discussed above, I respectfully concur in part and dissent in part.